UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

LUCAS McDONOUGH,                          Case No. 19-CV-2238 (PJS/TNL)

        Plaintiff,

v.                                                                    ORDER

CLIFTON TOLES; CITY OF
MINNEAPOLIS; FOSSLAND-OLSON,
INC., d/b/a The 1029 Bar,

        Defendants,

---

Michael Stinson, Edward B. Magarian, and Ian Blodger, DORSEY & WHITNEY LLP, for plaintiff.

M. Gregory Simpson, Leatha G. Wolter, and Blake P. DeRosier, MEAGHER & GEER, P.L.L.P.; Daniel J. Singel and Jessica A. Zeletes, McCOLLUM, CROWLEY, MOSCHET, MILLER & LAAK, LTD., for defendant Clifton Toles.

Sara J. Lathrop, Sarah C.S. McLaren, and Tracey N. Fussy, MINNEAPOLIS CITY ATTORNEY'S OFFICE, for defendant City of Minneapolis.

James C. Kovacs and Steven E. Tomsche, TOMSCHE, SONNESYN & TOMSCHE, P.A., for defendant Fossland-Olson, Inc., d/b/a The 1029 Bar.

Plaintiff Lucas McDonough was severely injured when defendant Clifton Toles, an off-duty Minneapolis police officer, put him in a chokehold, dragged him outside a bar, and punched him in the face.  McDonough brings this action against defendants Toles, the City of Minneapolis ("the City"), and Fossland-Olson, Inc., d/b/a The 1029 Bar ("the Bar"), asserting claims under 42 U.S.C. § 1983 and state law.

This matter is before the Court on defendants' motions to dismiss.  For the reasons that follow, the Court denies Toles's motion, grants in part and denies in part the City's motion, and grants the Bar's motion.

## I.  BACKGROUND

On December 23, 2017, McDonough and some of his friends went out for the evening, eventually arriving at the Bar in Northeast Minneapolis.  Compl. ¶¶ 7, 14. Toles, who was off duty, was also at the Bar that evening, consuming alcohol and socializing with employees and patrons.  Compl. ¶¶ 19-21, 74.  Toles was a regular who often volunteered to help the Bar's security personnel when there were "problems at the bar."  Compl. ¶ 86.

Just before bar close, McDonough was waiting for his friends and chatting with two women he had just met, "W1" and "W2."  Compl. ¶ 15.  A third woman, "W3," joined the group; McDonough had likewise never met her before.  Compl. ¶¶ 17, 70. Earlier that evening, Toles had met and exchanged numbers with W3, and the two had spoken intermittently throughout the evening.  Compl. ¶¶ 19-20.

About the time that W3 joined the group, Toles also approached.  Compl. ¶ 22. McDonough attempted to include Toles in the group's conversation.  Compl. ¶ 23. Toles accused McDonough of being disrespectful.  Compl. ¶ 24.  Before McDonough could respond, Toles announced himself as a Minneapolis police officer and put

McDonough in a chokehold.  Compl. ¶ 25.  In later interviews, the three women in the group all indicated that McDonough had not been disrespectful and that Toles's aggression was unprovoked.  Compl. ¶¶ 56-61, 64, 68-69.

Toles asked Mike Wells, a Bar security employee, for help in forcibly removing McDonough from the Bar.  Compl. ¶ 25.  Wells and Toles are well acquainted; the Bar's security video for that evening shows the two playing pull tabs, talking, laughing, and embracing.  Compl. ¶¶ 74-75.

Wells did not hear Toles announce himself as a police officer and did not believe that he was acting as one.  Compl. ¶ 26.  Together, Wells and Toles removed McDonough from the Bar while McDonough struggled to breathe.  Compl. ¶ 32.  In the Bar's security video, McDonough appears to be reaching up to try to loosen Toles's chokehold, and Wells can be seen grabbing McDonough's arm and pulling it down. Kovacs Decl. Ex. A.

Wells cleared a path for Toles to drag McDonough outside via a locked exit door not normally used by patrons.  Compl. ¶ 34.  Once outside, Toles released McDonough. Compl. ¶ 37.  McDonough turned around and, without warning, Toles punched him in the face.  Compl. ¶ 38.  The force of the punch fractured McDonough's cheekbone and rendered him unconscious, causing him to fall defenselessly to the ground.  Compl.

¶¶ 39-40.  McDonough's head split open upon hitting the ground, causing a concussion, brain bleed, and traumatic brain injury.  Compl. ¶ 41.

Neither Toles nor any Bar employee called 911 or did anything else to help McDonough.  Compl. ¶¶ 42-43.  Instead, with Wells's encouragement, Toles fled the scene, leaving McDonough bleeding on the sidewalk.  Compl. ¶¶ 44-45.  Meanwhile, having watched Toles and Wells remove McDonough from the Bar, W2 hurried to the customer exit and ran around the building, where she found McDonough bleeding from his head and unaware of his surroundings.  Compl. ¶¶ 48-49.  W2 called 911, and McDonough was transported to the Hennepin County Medical Center.  Compl. ¶¶ 50-51.

Minneapolis police officers arrived at the scene and began an investigation. Wells falsely told the officers that he did not know the man who had assaulted McDonough.  Compl. ¶¶ 75-76.  Wells also falsely told the officers that both of the men had been kicked out of the Bar, that both were shoving each other, and that McDonough had swung first, at which point the other man punched him.  Compl. ¶ 77.

Shortly after the incident, Toles contacted his superior officer and told him what had happened.  Compl. ¶ 94.  Toles then completed a written police report about the incident, describing it as though he had detained a citizen in the course and scope of his employment as a police officer.  Compl. ¶ 95.  The report's account of the incident is

-4-

largely false.  For example, the report claims that, while inside the Bar, McDonough used vulgar language and pushed Toles in a belligerent manner, Compl. ¶ 107; that Toles asked Wells for help and McDonough came toward Toles in a threatening manner, Compl. ¶ 116; that Toles escorted McDonough outside using an arm-bar technique and repeatedly asked him to go home, Compl. ¶¶ 120, 122; that McDonough swung at Toles's face and Toles reacted instinctively by hitting back, causing McDonough to fall, Compl. ¶ 122; that Bar staff took control of McDonough, who was able to sit up and speak, Compl. ¶ 122; and that Toles asked the Bar to call for emergency medical assistance before leaving with his friends, Compl. ¶ 122.  All of this was false.  Compl. ¶ 122.

A few days later, after witnesses had identified the suspect as an officer with the Minneapolis Police Department ("MPD"), the investigation was turned over to the St. Paul Police Department ("SPPD").  Compl. ¶ 83.  Wells admitted to the SPPD that Toles was a regular who often helped with unruly customers at the Bar.  Compl. ¶ 86.  He also admitted that the men had not been fighting, that he did not know why Toles punched McDonough, and that after the assault he told Toles to get away.  Compl. ¶¶ 90, 92.  Wells never faced any consequences for initially lying to Minneapolis police. Compl. ¶ 81.

The MPD withheld Toles's written report from the SPPD on the ground that the report was "in violation of *Garrity* rules"—i.e., made involuntarily under threat of termination.[1]  Compl. ¶ 99.  As the MPD knew, this was false, as Toles had voluntarily completed the report without having been directed to do so.  Compl. ¶¶ 95-96, 99.

Toles did not talk to anyone from the SPPD until a month after the incident, when he agreed to come to SPPD headquarters with his attorney, Thomas Kelly.  Compl. ¶ 101.  Kelly is employed by the Minnesota Police and Peace Officers Association ("MPPOA").  Compl. ¶ 102.  MPPOA provides legal representation to its member officers in connection with "critical incidents" that might expose an officer to criminal liability.  Compl. ¶ 103.  A "critical incident" is an "action which arises from any act or omission within the scope of employment in which (a) serious injury or death occurs; or (b) the discharge of a weapon is involved."  Compl. ¶ 104.

In his interview with the SPPD, Toles gave a false account of his activities— a false account that differed from the false account that he had provided in his written report.  Compl. ¶¶ 106, 123.  This time, Toles did not claim that McDonough pushed him.  Compl. ¶ 110.  Instead, Toles claimed that he used force on McDonough because McDonough was walking toward him with a drinking glass and Toles feared that McDonough might use it as a weapon.  Compl. ¶ 108.  Toles's account is contradicted

---

[1]*See Garrity v. New Jersey*, 385 U.S. 493 (1967) (holding that officers' statements were involuntary when a refusal to answer would have subjected them to termination).

by the video evidence, by the accounts of the other witnesses, and by Toles's own

written report, which does not say anything about Toles being fearful that McDonough

might attack him with a drinking glass.  Compl. ¶¶ 109, 112-13.  Toles also claimed for

the first time that he left the scene because McDonough's friends came outside and

confronted him.  Compl. ¶ 123.  That never happened.  Toles also claimed during the

interview that his supervising officers had instructed him to write a report about the

incident; Toles lied about this fact so that the report could not be used against him.

Compl. ¶¶ 132-33.

As a result of Toles's assault, McDonough was hospitalized over the holidays

and now has permanent cognitive deficits and no sense of taste or smell.  Compl. ¶¶ 53-

54.  McDonough's injuries have left him unable to work in his profession as a comedian

and actor.  Compl. ¶ 53.

## II.  ANALYSIS

### A.  Standard of Review

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ.

P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and

draw all reasonable inferences in the plaintiff's favor.  *Aten v. Scottsdale Ins. Co.*, 511 F.3d

818, 820 (8th Cir. 2008).  Although the factual allegations need not be detailed, they

must be sufficient to "raise a right to relief above the speculative level . . . ."  *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d).  But the court may consider materials that are necessarily embraced by the complaint as well as any exhibits attached to the complaint without converting the motion into one for summary judgment.  *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).  In this case, the Court has considered the Bar's security video of the incident, as its contents are described in the complaint, and as its authenticity is not disputed.  The Court has not considered any other materials submitted by the parties.

## B.  Color of Law

McDonough brings claims against Toles and the City under 42 U.S.C. § 1983, alleging violations of his constitutional rights.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  Both Toles and the City

move to dismiss on the ground that McDonough has failed to plausibly allege that Toles was acting under color of law.[2]

A government official acts under color of law when "a sufficient nexus exists between the official's public position and the official's harmful conduct." *Ramirez-Peyro v. Holder*, 574 F.3d 893, 900 (8th Cir. 2009). This is a "fact intensive" inquiry. *Id.* at 901. In determining whether police officers acted under color of law, courts consider such factors as "whether the officers are on duty and in uniform, the motivation behind the officers' actions, and whether the officers had access to the victim because of their positions, among others." *Id.* Additional factors include whether the officer specifically invoked his official status, whether the officer was in a place to which only officers have access, and whether the officer threatened to use official authority in the future. *Id.*

Here, McDonough has plausibly alleged that Toles was acting under color of law. Before placing McDonough in a chokehold, Toles announced himself as a police officer. Toles most likely did so to gain McDonough's compliance and to notify bystanders that Toles was acting pursuant to lawful authority, and therefore they should not try to intervene on McDonough's behalf. *See Pitchell v. Callan*, 13 F.3d 545,

---

[2]Toles and the City argue that whether an official was acting under color of law is a legal question. The Court need not resolve the issue at this stage, but notes that the Eighth Circuit has treated it as a factual issue for the jury. *See Dossett v. First State Bank*, 399 F.3d 940, 947-50 (8th Cir. 2005) (holding that the district court's "color of law" instruction was unduly narrow and remanding for a new trial).

548 (2d Cir. 1994) ("liability may be found where a police officer, albeit off-duty,

nonetheless invokes the real or apparent power of the police department").  Notably,

under MPD regulations, off-duty officers have the discretion to exercise "peace officer

authority" within the City.  Compl. ¶ 134.  Thus, a Minneapolis police officer is

explicitly authorized to exercise official authority—that is, act under color of law—even

while off duty.

       After invoking his official authority, Toles placed McDonough in a chokehold,

called for help from the Bar's bouncer, and removed McDonough from the Bar.

Forcibly removing a customer from a bar is, of course, something that is commonly

done by private security guards, but it is also something that is commonly done by

police officers acting within the scope of their official duties.  *Cf. Hannah v. Jensen*, 298

N.W.2d 52, 54-55 (Minn. 1980) (an officer's removal of a patron from a bar was part of

the officer's official duties), *superseded by statute on other grounds as stated in Lang v.*

*Glusica*, 393 N.W.2d 181, 183 n.1 (Minn. 1986); *West*, 487 U.S. at 56 n.15 ("the fact that a

state employee's role parallels one in the private sector is not, by itself, reason to

conclude that the former is not acting under color of state law in performing his

duties"); *Griffin v. Maryland*, 378 U.S. 130, 135 (1964) ("If an individual is possessed of

state authority and purports to act under that authority, his action is state action.  It is

irrelevant that he might have taken the same action had he acted in a purely private capacity or that the particular action which he took was not authorized by state law.").[3]

After the incident, Toles completed a police report, which is evidence that during the incident, he had been acting within the scope of his duties as a police officer. Citing *Garrity*, the MPD refused to provide Toles's report to the SPPD investigators, thereby representing that Toles had been required to produce the report as part of his official duties—which is further evidence that Toles was acting under color of law during the incident. Finally, the MPPOA provided legal counsel to Toles, which the union would not have done unless Toles had acted within the scope of his duties as an officer.

Toles and the City nevertheless argue that there is no nexus between Toles's actions and his status and duties as a police officer. They point out that Toles was not on duty or wearing a uniform or a badge, did not arrest McDonough, was not in a place where only officers have authority to be, and did not threaten to use official authority against McDonough in the future. They also contend that, according to McDonough's own allegations, McDonough was not doing anything that would have given Toles any basis to remove him from the Bar or arrest him. Instead, they argue, the allegations

---

[3]For ease of discussion, the Court uses "state action" and "color of law" interchangeably. *Cf. Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982) ("it is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical").

establish that Toles attacked McDonough for purely personal reasons.  They further contend that identifying oneself as a police officer is not sufficient to establish action under color of law.  Finally, Toles argues that events occurring after the alleged § 1983 violation—such as Toles writing a police report and the MPD withholding that report from the SPPD under *Garrity*—are legally irrelevant to the determination of whether Toles acted under color of law.

It is true that relevant factors point both ways in this case—some supporting a finding of state action, and others supporting a finding of private conduct.  It is important to remember, however, that this is a fact-intensive inquiry, *see Ramirez-Peyro*, 574 F.3d at 901, and that the factors identified in *Ramirez-Peyro* are neither exclusive nor individually dispositive.  And while the *presence* of a particular factor—such as the officer being in a place that he could only access using his official authority—might be strong evidence of state action, the *absence* of the same factor might not be strong evidence of a lack of state action.  For example, much official police work takes place in publicly accessible locations—such as roadways and sidewalks—but no one would seriously contend that, as a result, such conduct is not under color of law.

Consequently, while the factors that Toles and the City cite are relevant to the inquiry, their absence does not establish lack of state action in light of Toles's explicit invocation of his official authority, Toles's treating the incident as within his official

duties by completing a police report, and the MPD itself treating the incident as within

Toles's official duties by withholding Toles's police report under *Garrity*. These facts

also distinguish this case from the cases on which Toles and the City rely; in those cases,

the officers never purported to be exercising official authority. *See Roe v. Humke*, 128

F.3d 1213, 1217 (8th Cir. 1997) (officer not acting under color of law when he sexually

assaulted a child at his own residence while off duty; "knowledge of Humke's status

alone by Doe and her parents is not sufficient to convert the actions Humke took in the

pursuit of his private interests into action taken under color of state law"); *Watkins v.

Oaklawn Jockey Club*, 183 F.2d 440, 443 (8th Cir. 1950) (off-duty officers were working

solely for the racetrack pursuant to the racetrack's instructions and did not purport to

be exercising any state authority); *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 839-40 (9th

Cir. 1996) (off-duty officer who robbed a home did not purport to be acting under color

of law; mere fact that victim recognized him as a police officer did not transform private

acts into state action).

Toles and the City also contend that, according to McDonough's own allegations,

McDonough was not doing anything that would have given Toles any basis to remove

him from the bar or arrest him. Instead, they argue, the allegations establish that Toles

attacked McDonough for personal reasons. It is true that "'acts of officers in the ambit

of their personal pursuits are plainly excluded.'" *Humke*, 128 F.3d at 1216 (quoting

*Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality opinion)).  But an officer who

abuses official authority to further his private interests is still acting under color of law.

*United States v. Colbert*, 172 F.3d 594, 596-97 (8th Cir. 1999) (finding that officer acted

under color of law even though his motive was personal); *Marmorato v. Holder*, 376 F.

App'x 380, 385 (5th Cir. 2010) ("We have recognized on numerous occasions that acts

motivated by an officer's personal objectives are 'under color of law' when the officer

uses his official capacity to further those objectives."); *United States v. Giordano*, 442 F.3d

30, 43 (2d Cir. 2006) ("it is well-established that an official may act under color of law

even when he or she encounters the victim outside the conduct of official business and

acts for reasons unconnected to his or her office, so long as he or she employs the

authority of the state in the commission of the crime"); *United States v. Christian*, 342

F.3d 744, 751-52 (7th Cir. 2003) (finding that officer acted under color of law even

though his motive was personal); *Gibson v. City of Chicago*, 910 F.2d 1510, 1518 (7th Cir.

1990) ("an officer who, motivated by personal animus, misuses his lawfully possessed

authority to injure the plaintiff may be found to be acting under color or 'pretense' of

law").

Here, the complaint alleges that Toles explicitly invoked his authority as a police

officer to help him remove McDonough from the Bar.  That Toles may have been

motivated by personal animus against McDonough does not mean that Toles was not

acting under color of law.  As countless courts have recognized, § 1983 reaches not just

the use, but also the abuse, of official authority.  *See Screws*, 325 U.S. at 111 ("Acts of

officers who undertake to perform their official duties are included whether they hew to

the line of their authority or overstep it.") (plurality opinion); *Barna v. City of Perth*

*Amboy*, 42 F.3d 809, 816 (3d Cir. 1994) (actions in an officer's official capacity are under

color of law "whether the complained of conduct was in furtherance of the state's goals

or constituted an abuse of official power").

Toles and the City next argue that identifying oneself as a police officer is

insufficient to establish state action.  It is true that, based on all of the facts and

circumstances of a case, an officer may be found not to have acted under color of law,

even though the officer identified himself as a police officer.  *See Magee v. Trs. of Hamline*

*Univ.*, 747 F.3d 532, 536 (8th Cir. 2014) ("While his editorial noted he was an officer, this

recites his occupation and does not necessarily indicate he was acting in his official

capacity.").  But that is the exception, not the rule.  "[O]ff-duty police officers who

purport to exercise official authority will generally be found to have acted under color

of state law."  *Barna*, 42 F.3d at 816 (noting that "[m]anifestations of such pretended

authority may include . . . identifying oneself as a police officer").

Toles and the City point to various cases in which a police officer was found not

to be acting under the color of law, even though he had identified himself as a police

officer.  For the most part, though, these cases are distinguishable.[4]  *See Gibson*, 910 F.2d

at 1512, 1517-18 (officer's attempted invocation of authority was ineffective where the

police department had earlier declared him mentally unfit for duty, placed him on

medical leave, relieved him of all authority to exercise any police powers, and directed

him not to carry a weapon); *Zienciuk v. City of Chicago*, No. 01 C 3769, 2002 WL 1998309,

at *5-6 (N.D. Ill. Aug. 28, 2002) (off-duty officers who beat plaintiff in a bar were not

acting under color of law where the fight was provoked by a derogatory remark and

they did not reveal their status until after the fight had begun and the plaintiff had

asked the bartender to call the police).

It is true that, in *Parrilla-Burgos v. Hernandez-Rivera*, the First Circuit found no

state action despite the officer's invocation of his authority as a police officer to calm a

crowd of bystanders who were watching a hostile encounter involving the officer.  108

F.3d 445 (1st Cir. 1997).  But the First Circuit explicitly recognized that the invocation

---

[4]Toles and the City cite two unpublished decisions from the Eastern District of California (both issued by the same judge) in which officers identified themselves in a manner seemingly calculated to invoke their official authority and yet were found not to be acting under color of law.  *See Moland v. City of Ceres*, No. 1:16-CV-01073-LJO-SKO, 2017 WL 220309 (E.D. Cal. Jan. 18, 2017); *Sinks v. Cty. of Fresno*, No. CV-F-11-1990-LJO-SKO, 2012 WL 174969 (E.D. Cal. Jan. 20, 2012).  The Court does not find these decisions to be persuasive, particularly as they give a great deal of weight to whether the officers' assertion of authority succeeded in impacting the behavior of others.  *Moland*, 2017 WL 220309, at *6; *Sinks*, 2012 WL 174969, at *5.  Moreover, in this case there are other factors strongly indicating that Toles was acting under color of law, including that Toles completed a police report about the incident and that the MPD subsequently treated that report as having been completed as part of Toles's official duties.

weighed in favor of finding state action.  *Id.* at 450.  The First Circuit nevertheless found

no state action because the fatal encounter—which occurred after a brief interval of

calm that followed the officer's invocation of authority—began when the plaintiffs'

decedent challenged the officer to a fight.  *Id.* at 447, 450-51.  At that point, the First

Circuit held, there was no possibility that the plaintiffs' decedent was intimidated by

the officer's claims of official authority and no pretense that the two were engaged in

anything other than a private dispute.  *Id.* at 450-51.

The facts alleged in McDonough's complaint differ in important ways from the

facts of *Parrilla-Burgos*.  Unlike the plaintiffs' decedent in *Parrilla-Burgos*, McDonough

did not challenge a police officer to a fight.  Instead, Toles invoked his police authority

and then immediately restrained McDonough in a chokehold and removed him from

the Bar, exactly as an officer seeking to subdue an unruly patron might do.

Finally, Toles argues that events occurring after the alleged § 1983 violation are

legally irrelevant, citing *Myers v. Bowman*, 713 F.3d 1319 (11th Cir. 2013) and *Corder v.

Metropolitan Government of Nashville & Davidson County*, 899 F.2d 14, 1990 WL 33708 (6th

Cir. 1990) (per curiam) (unpublished table decision).  That is not the law.  *Myers* and

*Corder* simply found that the *particular* conduct engaged in by the defendant after the

alleged § 1983 violations was not sufficient to establish that the defendant had earlier

been acting under color of law.  *Myers* and *Corder* did not hold that post-violation

conduct is never even *relevant* to the question of whether the defendant earlier acted under color of law. *See Myers*, 713 F.3d at 1329-31 (holding that a government official's later invocation of authority during the plaintiff's arrest did not mean that the official was acting under color of law when he earlier reported that the plaintiff was committing a crime); *Corder*, 1990 WL 33708, at *2 (defendant's identification of himself as a police officer to other officers who arrived at the scene after the defendant shot the plaintiff did not mean that the officer was acting under color of law when he fired his gun).

Indeed, the Supreme Court has implicitly recognized that later events are relevant to determining whether an officer earlier acted under color of law. In *Belcher v. Stengel*, the Supreme Court granted certiorari to determine whether a regulation requiring off-duty officers to carry a weapon at all times meant that any use of that weapon would be under color of law. 429 U.S. 118, 119 (1976). After learning additional facts about the case, however, the Supreme Court determined that certiorari had been improvidently granted because "the question framed in the petition for certiorari is not in fact presented by the record now before us." *Id.* In particular, the Supreme Court noted that there was evidence that the officer had been granted leave and awarded worker's compensation because his injuries had been incurred in the course of employment and an investigative body had determined that the officer's

"actions were in the line of duty." *Id.* All of these events occurred after the shooting that was the subject of the lawsuit, but the Supreme Court clearly regarded them as relevant to the question whether the officer had been acting under color of law at the time.

The Court therefore denies Toles's and the City's motions insofar as they depend on the argument that Toles was not acting under color of law.

### C. Monell Claims

A municipality cannot be held vicariously liable under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, the plaintiff must establish that the municipality adopted a policy, custom, or practice that was the moving force behind the violation of the plaintiff's federal rights. *Id.* at 694. When liability is premised on an unofficial custom rather than official policy, the plaintiff must also demonstrate "the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees" and "deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct." *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (citation and quotation marks omitted).

Broadly speaking, McDonough alleges three bases for *Monell* liability against the City: (1) the City's alleged custom and practice of tolerating and covering up police

officers' use of excessive force; (2) the City's alleged failure to adequately train officers;

and (3) the City's allegedly inadequate screening procedures.

With respect to the excessive-force and failure-to-train claims:  The Court

emphasizes that, to survive a motion to dismiss, McDonough's allegations need only be

plausible, not probable.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("The plausibility

standard is not akin to a probability requirement . . . ." (citation and quotation marks

omitted)); *Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it

strikes a savvy judge that actual proof of those facts is improbable, and that a recovery

is very remote and unlikely." (citation and quotation marks omitted)).  Although the

question is close, the Court finds that McDonough has plausibly pleaded a *Monell* claim

that the City has a custom and practice of tolerating and covering up officers' use of

excessive force and a concomitant failure to adequately train officers in light of these

violations.  *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) (noting that a pattern of

similar constitutional violations is ordinarily necessary to demonstrate deliberate

indifference for purposes of failure to train).

McDonough alleges, among other things, that the City has tolerated egregiously

widespread violations of the MPD's policies regarding use of body cameras; that the

City has defied orders from state authorities to track compliance with body-camera

requirements; that the City has taken no action against officers who have given false

accounts of their use of force; and that, with rare exceptions, the City has meted out no

discipline to officers who have been accused of using excessive force.  McDonough's

allegations are not simply conclusory; rather, he pleads facts in support of each

allegation.  Although not all of these alleged practices are directly implicated in Toles's

alleged assault of McDonough (for example, Toles was not required to wear a body

camera while off duty), together they lend plausibility to McDonough's allegation that

the City has demonstrated deliberate indifference to police officers' use of excessive

force.  The Court therefore denies the City's motion to dismiss this aspect of

McDonough's *Monell* claims.

       With respect to the inadequate-screening claim:  McDonough alleges that, in

2012, the MPD began using the services of a psychiatrist who lacked any training or

experience in evaluating candidates for positions as police officers and that the

psychiatrist then reduced the number of psychological screening tests from five to one.

Compl. ¶¶ 273, 280-81, 283-94.  McDonough alleges that the psychiatrist's decision was

contrary to "best practices" followed in other jurisdictions (which use multiple tests)

and that the City ignored a study finding that the discontinued tests had been effective

in identifying problematic officers.  Compl. ¶¶ 274, 295-96.  McDonough further alleges

that, in employing the services of a psychiatrist (instead of a psychologist), the City

acted inconsistently with Minn. R. 6700.0700(I), which requires that candidates be

evaluated by "a licensed psychologist to determine that the applicant is free from any emotional or mental condition which might adversely affect the performance of peace officer duties." Compl. ¶ 283.

Because "[i]n the broadest sense, every injury is traceable to a hiring decision," the Supreme Court has cautioned that "[c]ases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 415 (1997). For that reason, such claims are subject to particularly "rigorous" and "stringent" scrutiny. *Id.* To succeed on such a claim, McDonough must show that a reasonable policymaker would conclude that the use of excessive force would be the "plainly obvious consequence" of the City's allegedly inadequate screening procedures. *Id.* at 411.

McDonough's allegations do not come close to clearing this high hurdle. McDonough's complaint says virtually nothing about the allegedly inadequate test and thus fails to plead any facts suggesting that the test is so clearly inadequate that the "plainly obvious consequence" of relying on it would be the use of excessive force. Likewise, even assuming that a widespread pattern of constitutional violations would be sufficient to show deliberate indifference, McDonough has alleged no such pattern; he identifies only two prior incidents involving officers hired under the allegedly

inadequate procedures (neither of whom was Toles).[5]  Compl. ¶¶ 213, 300.  The

allegations that other jurisdictions use additional tests—and that the discontinued tests

were effective at identifying problematic candidates—are insufficient to show deliberate

indifference.  *See Snyder v. Trepagnier*, 142 F.3d 791, 797 & n.5 (5th Cir. 1998) (rejecting

argument that psychological testing that fell short of "national standards" evinced

deliberate indifference), *cert. dismissed*, 526 U.S. 1083 (1999).  The Court therefore grants

the City's motion to dismiss McDonough's *Monell* claims to the extent they are based on

allegedly inadequate screening procedures.

---

[5]*Brown* makes clear that "a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury."  *Brown*, 520 U.S. at 412.  Instead, *Brown* requires the plaintiff to prove that "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff."  *Id.*  McDonough has not alleged a plausible claim under this standard.

The Court notes that in *Brown*, unlike here, the plaintiff did not allege an inadequate hiring process, but rather challenged a single bad hiring decision.  Even if this distinction means that McDonough could state a claim by showing a pattern of unconstitutional conduct, *cf. Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 31 (1st Cir. 2005) (discussing and rejecting such a claim), McDonough has failed to plausibly allege such a pattern.

### D.  The Bar's Motion

#### 1.  Negligence

McDonough contends that the Bar is liable for negligence under two theories: (a) innkeeper liability and (b) voluntary assumption of duty.  The Court considers each theory in turn.

#### a.  Innkeeper Liability

"Minnesota law imposes upon a tavern operator the duty to see to it that a patron is not injured by vicious or drunken individuals whom he permits to frequent his establishment."  *Devine v. McLain*, 306 N.W.2d 827, 830 (Minn. 1981) (citation and quotation marks omitted).

> In order to establish an innkeeper's liability, a plaintiff must prove four elements: (1) the proprietor must be put on notice of the offending party's vicious or dangerous propensities by some act or threat, (2) the proprietor must have an adequate opportunity to protect the injured patron, (3) the proprietor must fail to take reasonable steps to protect the injured patron, and (4) the injury must be foreseeable.

*Boone v. Martinez*, 567 N.W.2d 508, 510 (Minn. 1997).  The Bar argues that McDonough has failed to plausibly plead that the Bar was on notice of Toles's "vicious or dangerous propensities" or that McDonough's injury was foreseeable.

The Minnesota Supreme Court has often addressed the foreseeability of injuries suffered during altercations in or immediately outside of bars.  The court has found that foreseeability was a jury question in cases in which the bar had some kind of notice of

-24-

the danger, either because there were drunk and disorderly patrons at the bar or

because the plaintiff's assailant had previously been involved in fights in the bar.  *See*

*Henson v. Uptown Drink, LLC*, 922 N.W.2d 185, 193 (Minn. 2019) (jury could find

foreseeability where "there was evidence of both obvious intoxication and problematic

interactions with bar employees and other patrons"); *Quinn v. Winkel's, Inc.*, 279 N.W.2d

65, 68 (Minn. 1979) (jury could find foreseeability where bar knew of assailants'

reputations for violence and one of the assailants had previously been in fights on the

premises); *Mettling v. Mulligan*, 225 N.W.2d 825, 827, 829 (Minn. 1975) (jury could find

foreseeability where Mulligan had previously been in fights at the bar, the bar was

aware of Mulligan's pugnacious tendencies, and the bar had in fact banned Mulligan

from the premises but failed to enforce the ban); *Klingbeil v. Truesdell*, 98 N.W.2d 134,

137-38 (Minn. 1959) (jury could find foreseeability where group of patrons had been

drinking all day and had argued with and threatened the plaintiff).

By contrast, the court has found that the plaintiff's injury was not foreseeable as a

matter of law when it occurred with little or no warning of the danger.  *See Boone*, 567

N.W.2d at 511 (despite evidence that assailant was obviously intoxicated, looked angry,

and had "half-slam[med]" his beer on the table, plaintiff's injury was not foreseeable

where assailant "approached [plaintiff] from behind and suddenly struck him on the

head with a beer mug,"); *Schwingler v. Doebel*, 309 N.W.2d 760, 762-63 (Minn. 1981)

(plaintiff's injury was not foreseeable where, although bar owner knew that the assailant had a short temper and a previous assault conviction, and although there was a short altercation at the bar, the plaintiff left immediately afterward and the confrontation appeared to be over); *Devine*, 306 N.W.2d at 830-31 (plaintiff's injury was not foreseeable where assailant left the bar after an initial altercation and assailant's statement that she would be back was not sufficient to put bar on notice that she intended to cause harm upon her return); *Filas v. Daher*, 218 N.W.2d 467, 469-71 (Minn. 1974) (plaintiff's injury was not foreseeable where family of assailants were not obviously intoxicated and no one could have anticipated that, after a seven- to eight-minute scuffle between plaintiff and the family, an otherwise uninvolved family member would suddenly hit plaintiff over the head with a beer bottle).

This case much more closely resembles the cases in which the Minnesota Supreme Court found no foreseeability as a matter of law than the cases in which the Minnesota Supreme Court left the issue to a jury.  There is no allegation that Toles was noticeably intoxicated or acted belligerently at any point until his confrontation with McDonough.[6]  That confrontation took place very quickly:  Toles accused McDonough

---

[6]Indeed, in his response to the City's motion to dismiss, McDonough asserts that "[t]he Complaint does not allege that Officer Toles was intoxicated or that he had consumed more alcoholic beverages than permitted for a MPD officer to engage in the exercise of peace officer authority."  ECF No. 47 at 39.  (The Court cites to the electronically generated page number at the top right corner of the page.)

of being disrespectful, put McDonough in a chokehold before McDonough could even respond, immediately removed McDonough from the premises, and, finally, punched McDonough without any warning.  All of this happened within a minute or so.

True, Wells was not only aware that Toles had put McDonough in a chokehold, but actually helped Toles remove McDonough from the Bar.  Given the facts alleged in the complaint, however, McDonough has not pleaded any reason why Wells would have known that Toles was doing something wrong.  Toles was an off-duty police officer who was a regular at the Bar and who had often helped the Bar to deal with unruly customers.  As noted, Toles had not done anything out of the ordinary that evening.  McDonough does not allege that Wells observed the beginning of Toles's interaction with McDonough, nor does McDonough allege any other facts that would have given Wells a basis to conclude that Toles was acting improperly.  To the contrary, McDonough alleges that Wells did not hear Toles announce himself as a police officer, suggesting that Wells did not observe the initial interaction.[7]  For all that appears from the complaint, therefore, Wells had no reason to believe that Toles was doing anything other than properly removing an unruly patron, as Toles had done many times in the past.

_____

[7]For this reason, McDonough's allegations that the female witnesses recognized that Toles was using excessive force are not relevant.

The Court also rejects McDonough's argument that the chokehold itself provided notice of Toles's violent propensities.  McDonough's injuries were caused by the punch, not the chokehold.  Even if Wells could have immediately deduced that the particular chokehold that Toles applied to McDonough constituted excessive force under the circumstances, that would not have given Wells notice that Toles would follow up the chokehold by punching McDonough in the face without warning.  Using an overly aggressive maneuver to quickly gain control of and remove a person from a bar is categorically different from sucker punching that person in the face after he has already been removed.

The fact that Toles had previously used force against Bar patrons is similarly insufficient.  As noted, the Bar permitted Toles to use force in order to assist security personnel with unruly patrons.  McDonough does not allege that Toles ever used excessive force on any customer of the Bar until his encounter with McDonough.

Finally, McDonough alleges that Wells chose to clear a path to an exit door because he knew that there would be no witnesses and no camera at that location.  In the absence of any other plausible allegation that Wells had notice that Toles might punch or otherwise attack McDonough once they were outside the building, however, this is insufficient to show foreseeability.

McDonough compares this case to *Henson*, but *Henson* is distinguishable.  In

*Henson*, two friends (Anderson and Sunby) were drinking together at the defendant bar.

*Henson*, 922 N.W.2d at 188.  About 15 minutes before the plaintiff's decedent was fatally

injured, Sunby had become noticeably drunk—and about 10 minutes before the injury

was inflicted, Sunby had fallen off his bar stool.  *Id.*  Meanwhile, Anderson (who was

out of range of the bar's security camera) had attracted the attention of bar staff by

bothering two women whom he did not know.  *Id.*  About nine minutes before the

injury, Sunby began making loud, rude remarks to other patrons.  *Id.*  Five minutes

later, a bartender took Sunby's drink away and asked him to leave.  *Id.*  Meanwhile, at

some point, a server asked the manager to intervene with Anderson because he was

making the women uncomfortable; about two minutes before the injury, Anderson

reappeared in the security video, escorted by the manager.  *Id.*  In the last 30 seconds, a

scuffle ensued, and Henson (an off-duty employee of the bar) pulled Anderson off of

the manager.  *Id.*  As Henson and the manager were escorting Anderson outside, all

three tripped and fell, causing Henson to suffer a fatal brain injury.  *Id.* at 189.

The Minnesota Supreme Court observed that the question of foreseeability was

close.  *Id.* at 192.  It nevertheless found sufficient evidence for a jury to find

foreseeability, noting that Anderson's behavior had attracted attention nearly

15 minutes before the fatal injury and that Sunby was in an altercation and had been

asked to leave 10 minutes after that.  *Id.*  As the court observed, even before the final

scuffle, "there was evidence of both obvious intoxication and problematic interactions

with bar employees and other patrons." *Id.* at 193.

In contrast to the approximately 15-minute span of time during which trouble

was brewing in *Henson*, in this case only about a minute passed between the point at

which Toles unexpectedly placed McDonough in a chokehold and the point at which

Toles unexpectedly punched McDonough in the face.  And as discussed above, up until

the point at which Toles punched McDonough, Toles's actions were consistent with his

longstanding history of assisting the Bar with unruly patrons.  As a result, this case

closely resembles *Boone* and other cases in which the attack was "sudden and

unforeseeable." *Boone*, 567 N.W.2d at 511.  The Court therefore grants the Bar's motion

to dismiss this claim.

### b. *Voluntary Assumption of Duty*

McDonough next argues that, by employing security personnel, the Bar

voluntarily assumed a duty of care toward its patrons.  The problem with this argument

is that, as discussed above, the Bar already *owed* McDonough a duty of care by virtue of

the fact that it was a bar.  *Alholm v. Wilt*, 394 N.W.2d 488, 490 (Minn. 1986) ("Tavern

owners in Minnesota have the duty to exercise reasonable care under the circumstances

to protect their patrons from injury."); *Mettling*, 225 N.W.2d at 827-28 ("This court has

long recognized that tavern owners are under a duty to exercise reasonable care in maintaining orderly premises for the protection of their patrons."); *Klingbeil*, 98 N.W.2d at 138 ("when it appears that [an] intoxicated person might cause a disturbance or harm to other patrons, the proprietor is obliged to take some affirmative action to maintain order on the premises by demanding that such person leave or by calling authorities to enforce such demand").

McDonough does not explain how this allegedly voluntarily assumed duty of care differs from the duty of care that the Bar already owed him. Moreover, it would be strange indeed—and inimical to public policy—if the mere fact that a bar hired security personnel in an effort to comply with its already-existing duty of care had the effect of making that duty stricter or otherwise expanding the bar's liability. Likely for these reasons, McDonough has not cited, and the Court has not found, any case holding that, under Minnesota law, a bar that employs security personnel voluntarily assumes a duty of care that is distinct or different from its already-existing duty of care to its patrons.

McDonough relies on *Nickelson v. Mall of America Co.*, 593 N.W.2d 723 (Minn. Ct. App. 1999), in which the Minnesota Court of Appeals held that the Mall of America had assumed a duty to its tenants. *Nickelson* is distinguishable, however. The Court of Appeals did remark that "Mall of America's action to hire a security force indicates that it assumed a limited duty to protect its tenants and their employees," *id.* at 726, but the

-31-

court did not rely on that circumstance alone.  Instead, the court primarily relied on the fact that the mall had explicitly assured its tenants that its security force would intervene whenever customers caused trouble.  *Id.* ("More important, however, is the fact that Mall of America security's intention to break up fights was communicated to Nickelson."); *cf. Robb v. Funorama, Inc.*, No. A04-1711, 2005 WL 1331265, at *5 (Minn. Ct. App. June 7, 2005) ("If appellant relied on Cheap Skate's security representations and refrained from taking action to protect himself based on that reliance, Cheap Skate voluntarily assumed the duty to protect.").  McDonough does not allege any such communications or representations in this case.

Setting that aside, it is worth noting that the Minnesota Supreme Court appears reluctant to impose liability for harm caused by third parties on the basis that a business provided security measures that it failed to reasonably maintain.  *See Funchess v. Cecil Newman Corp.*, 632 N.W.2d 666, 674-75 (Minn. 2001) (reversing the Court of Appeals, which had found a duty on the basis of *Nickelson* and other cases, and holding that a landlord did not have a duty to repair a locking mechanism on the apartment building's back door).  *Funchess* emphasized that a contrary rule would discourage businesses from *adopting* security measures, leaving customers less safe.  *Id.* at 675.  That same concern is at issue here, and the Court finds it unlikely that the Minnesota Supreme Court would hold that a bar voluntarily assumes an extra or heightened duty of care

simply because it attempts to comply with its already-existing duty of care by employing security personnel.  The Court therefore rejects McDonough's argument that the Bar voluntarily assumed such a duty to him and grants the Bar's motion to dismiss this claim.

### 2.  Section 1983

Finally, McDonough brings a claim against the Bar for aiding-and-abetting liability under § 1983.[8]  "A private party may be held liable under § 1983 only if it is a 'willful participant in joint activity with the State or its agents.'"  *Gibson v. Regions Fin. Corp.*, 557 F.3d 842, 846 (8th Cir. 2009) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)).  Pointing to the allegation in McDonough's complaint that Wells did not believe Toles to be acting as a police officer, the Bar argues that it necessarily could not have been a willful participant in joint activity with a state agent.  The Court agrees.

"Under § 1983, a plaintiff must establish not only that a private actor caused a deprivation of constitutional rights, but that the private actor willfully participated with state officials and reached a mutual understanding concerning the unlawful objective of a conspiracy."  *Dossett v. First State Bank*, 399 F.3d 940, 951 (8th Cir. 2005); *see also White*

---

[8]Courts have held that there is no such thing as aiding-and-abetting liability under § 1983.  *See, e.g.*, *Theriot v. Woods*, No. 2:09-CV-199, 2010 WL 623684, at *7 (W.D. Mich. Feb. 18, 2010) ("There is no civil aiding and abetting liability under 42 U.S.C. § 1983.").  The Court treats McDonough's claim as an assertion that the Bar was a willful participant in Toles's alleged § 1983 violation.

*v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008) ("The key inquiry is whether the private party was a willful participant in the corrupt conspiracy. . . . [T]he plaintiff must show evidence sufficient to support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights.").

In *Dossett*, a bank employee contended that the bank conspired with school officials to fire her in retaliation for her comments at a public school-board meeting. *Dossett*, 399 F.3d at 944.  The bank argued that it fired the plaintiff because it was facing a backlash and potential loss of business as a result of the plaintiff's comments.  *Id.* at 951.  The Eighth Circuit agreed that, if the bank had discharged the plaintiff as an exercise of business judgment or even because it "succumbed to economic pressure from school officials who threatened to withdraw the school board's significant bank account," the bank might not be liable under § 1983.  *Id.*  But, as the Eighth Circuit pointed out, the plaintiff claimed (and offered evidence that) "the Bank willfully participated with school officials to terminate her in retaliation for her exercise of First Amendment rights."  *Id.* at 952 (emphasis omitted).

Without knowledge that Toles was acting as a police officer, Wells would, at most, have understood that he was aiding and abetting one private citizen who was assaulting another private citizen.  *Dossett* makes clear that this is not enough.  Instead, Wells must have willfully participated in joint activity with a state actor to deprive

McDonough of federally protected rights.  As Toles's use of his police authority is a necessary element of this deprivation, McDonough's lack of knowledge of Toles's status means that he could not have been a willful participant.

This is not to say that Wells must have subjectively understood that Toles was violating McDonough's constitutional rights.  But Wells must have subjectively understood that Toles was acting under color of law.  A private actor can be held liable under § 1983 only when *it* acted under color of law.  *See id.* at 951 ("it is clear that a private entity acts under color of state law when engaged with state officials in a conspiracy to deprive a person of federal constitutional rights").  It is difficult to understand how Wells or the Bar could have been acting under color of law without any knowledge that Toles himself was acting under color of law.  Because McDonough affirmatively alleges that Wells did *not* know that Toles was acting as a police officer, his § 1983 claim against the Bar necessarily fails.[9]

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

---

[9]McDonough did not sue Wells, but only the Bar (Wells's employer).  The Court notes that, like a municipality, a corporation cannot be held vicariously liable under § 1983.  *Smith v. Insley's Inc.*, 499 F.3d 875, 880 (8th Cir. 2007).  As the Bar did not raise this issue, however, the Court does not address it further.

1.      The motion of defendant Fossland-Olson, Inc. to dismiss [ECF No. 18] is GRANTED.  Plaintiff's claims against Fossland-Olson, Inc. are DISMISSED WITHOUT PREJUDICE.

2.      The motion of defendant City of Minneapolis to dismiss [ECF No. 27] is GRANTED IN PART and DENIED IN PART.

    a.      The motion is GRANTED as to plaintiff's claims against the City insofar as those claims are based on plaintiff's allegations of inadequate screening.  Those claims are DISMISSED WITHOUT PREJUDICE.

    b.      The motion is DENIED in all other respects.

3.      The motion of defendant Clifton Toles to dismiss [ECF No. 42] is DENIED.

Dated:  August 4, 2020           s/Patrick J. Schiltz
                                 Patrick J. Schiltz
                                 United States District Judge